929 A.2d 1076

INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL NO. 68 WELFARE FUND, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFF–RESPONDENT, v. MERCK & CO., INC., DEFENDANT–APPELLANT.

Argued March 19, 2007—Decided September 6, 2007.

*John H. Beisner,* a member of the District of Columbia bar, argued the cause for appellant (*Dechert,* attorneys; *Mr. Beisner, Diane P. Sullivan* and *Richard Jasaitis, III,* on the briefs).

*Christopher A. Seeger,* argued the cause for respondent (*Seeger Weiss* and *Lynch Keefe Bartels,* attorneys; *Mr. Seeger, John E. Keefe, Jr., David R. Buchanan, Frederick S. Longer* and *Donald E. Haviland, Jr.,* on the briefs).

*Michael Dore,* argued the cause for *amicus curiae* Pharmaceutical Research and Manufacturers of America (*Lowenstein Sandler,* attorneys; *Mr. Dore* and *Rosemary E. Ramsay,* of counsel and on the brief).

*Theodore M. Lieverman,* argued the cause for *amici curiae* AARP; American Federation of State, County and Municipal Employees; Center for Medical Consumers; Central New York Citizens in Action; Citizen Action of New York; Commonwealth Care Alliance, Inc.; Florida Chain; Gray Panthers of Sacramento; Health Care for All; Lynn Health Task Force; Medicare Rights Center; New Jersey Citizen Action; New Jersey PIRG Law & Policy Center; Pennsylvania Employees Benefit Trust Fund; Prescription Access Litigation Project; United Senior Action of Indiana; Elaine Kleinman and Ronald Martin *(Spector Roseman & Kodroff,* attorneys; *Mr. Lieverman* and *David J. Cohen,* on the brief).

*Anita R. Hotchkiss,* submitted a brief on behalf of *amicus curiae* Product Liability Advisory Council, Inc. *(Porzio, Bromberg & Newman,* attorneys; *Ms. Hotchkiss* and *Michael E. Rowan,* on the brief).

*John F. Brenner,* submitted a joint brief on behalf of *amici curiae* The Commerce and Industry Association of New Jersey; The Somerset County Business Partnership and The Chemistry Council of New Jersey *(McCarter & English,* attorneys for The Commerce and Industry Association of New Jersey; *Norris McLaughlin & Marcus,* attorneys for The Somerset County Business Partnership and *Reed Smith,* attorneys for The Chemistry Council of New Jersey; *Mr. Brenner, Steven A. Karg* and *Steven J. Picco,* of counsel).

*Edward J. Fanning, Jr.* and *David R. Kott,* submitted a brief on behalf of *amicus curiae* Healthcare Institute of New Jersey *(McCarter & English,* attorneys; *Mr. Fanning, Mr. Kott* and *Marielena Piriz,* on the brief).

PER CURIAM.

In July 2005, a Law Division judge granted the motion of plaintiff International Union of Operating Engineers Local # 68 Welfare Fund "to certify a nationwide class of third-party[,] nongovernment payors who ... paid any person or entity for the purchase of a prescription anti-inflammatory arthritis and acute

pain medication marketed by defendant Merck & Company, Inc.
... under the brand name Vioxx." The Appellate Division affirmed that decision and defendant moved for leave to appeal to this Court.

We granted that motion for leave to appeal, agreeing to consider the propriety of the order certifying a nationwide class. Because we conclude that the court erred in finding that common questions of fact or law predominate and that a class action would be superior to other mechanisms for adjudicating the claims, we reverse.

## I.

We accept as true all of the allegations in the complaint in light of the fact that we are considering the issues in the context of a challenge to class certification. *See Riley v. New Rapids Carpet Ctr.*, 61 *N.J.* 218, 223, 294 *A.2d* 7 (1972); *see also Delgozzo v. Kenny*, 266 *N.J.Super.* 169, 180–81, 628 *A.2d* 1080 (App.Div. 1993) (citing *Blackie v. Barrack*, 524 *F.2d* 891, 901 n. 17 (9th Cir.1975), *cert. denied*, 429 *U.S.* 816, 97 *S.Ct.* 57, 50 *L.Ed.2d* 75 (1976)). For purposes of our analysis, we derive the essential facts from plaintiff's complaint and the record developed in connection with the motion for class certification.

## A.

According to the complaint, plaintiff "is a joint union-employer Taft–Hartley trust fund," [1] which is organized and operates pursu-

---

[1] The complaint does not specify whether plaintiff is organized as a New Jersey corporation, referring instead to the fact that it "is organized and operating in the State of New Jersey." We presume, for purposes of this analysis, that it qualifies as a consumer as that term is intended in our consumer fraud statute. We do so in recognition of the fact that the Consumer Fraud Act, although not defining the term "consumer," has been repeatedly recognized to be remedial legislation which should be construed liberally. *See Lettenmaier v. Lube Connection, Inc.*, 162 *N.J.* 134, 139, 741 *A.2d* 591 (1999); *Gennari v. Weichert Co. Realtors*, 148 *N.J.* 582, 604, 691 *A.2d* 350 (1997); *Joe D'Egidio Landscaping v.*

ant to the laws of New Jersey. As a part of its services, plaintiff acts as a party to benefit contracts, a policy issuer, and a sponsor of health benefit plans that provide prescription drug coverage for its members and beneficiaries. It is therefore a third-party payor, meaning that it makes payments to pharmaceutical companies for prescription medications for those for whom its benefit plans afford coverage.

Plaintiff asserts that as a third-party payor it made payments, and therefore incurred costs, for Vioxx, a prescription drug manufactured and marketed by defendant. More specifically, plaintiff asserts that it was induced to make those payments and incur those costs in response to defendant's wide-ranging fraudulent marketing scheme. In essence, the complaint alleges that defendant marketed its product as a safer and more effective alternative to other traditional pain medications, thus driving the price of its product substantially higher than the price charged for similar medications.

More to the point, however, plaintiff asserts that defendant did so through an aggressive marketing campaign undertaken at a time when defendant was aware that its product was neither more effective nor safer than other available products. Pointing in particular to three separate warning letters issued to defendant by the Food and Drug Administration (FDA), plaintiff asserts that defendant engaged in extensive efforts to conceal or otherwise minimize information coming to its attention to the effect that its product was not as safe as available alternatives.

At the same time, plaintiff contends that defendant was aware, through its ongoing clinical studies, that there were significant health and safety risks associated with continued use of its product and that defendant also either minimized or actively concealed

---

*Apicella,* 337 *N.J.Super.* 252, 258, 766 A.2d 1164 (App.Div.2001). Although one might argue that the relationship between plaintiff and defendant is more attenuated than the traditional consumer role as contemplated by the Consumer Fraud Act, we leave for another day the question of the Act's scope in light of our analysis of the other issues before us.

those studies from the FDA, the public, and third-party payors. In particular, plaintiff asserts that beginning in 1998, defendant's clinical studies and internal analyses of the use of Vioxx demonstrated a link between the medication and adverse cardiovascular side effects. In spite of that discovery, however, defendant continued its marketing and promotional campaign and concealed those adverse findings until the product was withdrawn from the market in September 2004.

## B.

Plaintiff also asserts that the defendant intentionally targeted third-party payors that oversee, and make payments for, the vast majority of purchases of prescription medications. Although the specific allegations about defendant's marketing campaign are not important to our analysis, plaintiff asserts, as part of its class action allegations, that defendant engaged in a uniform series of fraudulent activities in its dealings with all members of the proposed nationwide class. As such, plaintiff asserts that it can fairly represent the interests of a variety of third-party payors, including other Taft–Hartley funds like itself, as well as such diverse entities as corporate health insurers, health maintenance organizations, private employers, self-insured employers, and multi-employer union benefit organizations.

The parties do not dispute the manner in which this plaintiff or other third-party payors operate in making decisions about payments for particular medications. Whenever a plan member receives a prescription and takes it to be filled, the plan member must first demonstrate that he or she is covered by a third-party payor plan. In general, the plan member submits membership information, such as a prescription insurance card, to the dispensing pharmacy for verification and approval by the third-party payor. Once the plan member has done so, the dispensing pharmacy verifies that the prescribed medication is one that the third-party payor has authorized for purchase. The drugs that each third-party payor has authorized are included within that

third-party payor's approved purchase listing, known as a formulary.

Third-party payors do not independently select medications for inclusion in their formularies. Instead, each third-party payor relies on Prescription Benefit Managers (PBMs) whose functions include placing prescription drugs on the individual third-party payors' formularies. PBMs, in turn, utilize specialized committees of pharmacists, physicians, and healthcare professionals, which are known as Pharmacy and Therapeutics Committees (P & T Committees), to develop and maintain the formularies. The P & T Committees do so by conducting their own evaluation of the effectiveness, safety, and cost of each available medication.

In performing their function, P & T Committees evaluate a wide variety of available material bearing on the question of each drug's efficacy and safety. In general, according to plaintiff's expert, P & T Committees focus on materials referred to as "primary information." That includes published materials reporting on the results of randomized clinical trials; observational or epidemiological data; meta-analysis, which is a method of combining results of several studies in order to synthesize and evaluate data; and case reports. At least some of the published material rests on work done by or for the manufacturers of the particular products.

P & T Committees also consider information and data that is submitted to them by each product's manufacturer. In many cases, the manufacturer of a product being considered for inclusion in formularies compiles this information and data and submits it in a format known as a "formulary compendium." Defendant created such compendia in this case.

The P & T Committees' evaluations may result in the inclusion of a product on a particular third-party payor's formulary. The decision to include a medication, however, does not necessarily result in uniform treatment of that drug in every formulary, as each operates differently. Formularies are frequently comprised of tiers, with different treatment, for prescription authorization and payment purposes, accorded to the drugs assigned to different

tiers. In a tiered formulary, some therapeutic drugs are "preferred," which may result in a lower co-payment obligation for the plan member and may result in greater overall sales of the drug. At the other end of the spectrum, for purposes of a tiered formulary, the work performed by the P & T Committee might result in a decision that some prescription drugs are not authorized for purchase at all.

During the relevant time period, some PBMs relied on "open" formularies which essentially included all prescription medications that were approved by the FDA. Even open formularies, however, involve decisions by P & T Committees that determine how any specific medication will be treated for purposes of placement. Those decisions may result in conditions relating to how a third-party payor will cover the cost of a medication.

As a practical matter, each PBM, through the work performed by the P & T Committee and its creation of the formulary, sets the terms under which the third-party payor agreed to be responsible for the costs of its members' prescriptions. Plaintiff's expert contends that there is an agreed-upon set of principles and guidelines governing the practices of third-party payors and PBMs in making these decisions. He points out that "in October 2000, the Academy of Managed Care Pharmacy ('AMCP') published a *Format for Formulary Submission,* which is a standardized format for [manufacturers to submit] product, clinical, and economic data on a new drug."

Defendant's expert asserts that in spite of that effort to create a standardized format, the way in which PBMs operate in evaluating drugs for formulary purposes varies greatly. He certified that when he conducted his research, he discovered that, rather than operating in a uniform manner as plaintiff's expert opined, different managed care plans evaluated Vioxx and accorded it widely different formulary treatment. He found that because open formularies were common, Vioxx was included in most third-party payors' plans. Some, however, by giving it "preferred" status, assigned it to a "low co-payment tier." Others placed it in a "non-

preferred" tier where a high co-payment was required. In other plans, Vioxx prescriptions were essentially discouraged either because pre-approval was required before a physician could prescribe it or because it could only be prescribed after other, cheaper drugs had been tried without success. Defendant's expert also certified that different P & T Committees responded to ongoing releases of information about Vioxx in different ways, with some altering its placement in their formularies. He asserted that, as a factual matter, there are such divergences among class members and in how they analyzed the information received from defendant that class certification is inappropriate.

## C.

Central to plaintiff's class action assertions is its argument that defendant engaged in a fraudulent marketing campaign that induced, or was intended to induce, all third-party payors to accord Vioxx preferred status in their formularies. Plaintiff argues that if defendant had disclosed the adverse information about which it was aware concerning the safety and efficacy of the drug, plaintiff and the other class members either would not have authorized its inclusion in their formularies or would have placed it in a tier that would have discouraged consumers from purchasing it, and, therefore, would have reduced the amounts that third-party payors authorized for reimbursement of the drug's cost to plan members. Defendant argues that this argument amounts to nothing more than a "fraud on the market" theory that cannot be sustained in accordance with our law.

## II.

In seeking class certification,[2] plaintiff relied on the following definition of the proposed class, as set forth in its complaint:

---

[2] Because the complaint was filed in 2003, the federal Class Action Fairness Act of 2005, Pub.L. No. 109–2, 119 Stat. 4, codified as amended at 28 *U.S.C.A.* §§ 1453, 1711–1715 (2006), does not apply to any aspect of our analysis.

All third-party payors in the United States of America, who have paid any person or entity for the purchase of the prescription drug Vioxx (rofecoxib) since May 1, 1999. Third-party payors include any non-governmental entity that is (i) a party to a contract, issuer of a policy, or sponsor of a plan, which contract, policy, or plan provides prescription drug coverage to natural persons, and is also (ii) at risk, pursuant to such contract, policy, or plan, to purchase or pay for all or part of the cost of prescription drugs dispensed to natural persons covered by such contract, policy, or plan. Excluded from the Class are (1) employees of defendant, including its officers or directors; (2) plaintiff's counsel; and (3) the Judge of the Court to which this case is assigned.

It is against this definition of the proposed class that we must consider the analysis of the Law Division and of the Appellate Division supporting the certification of a nationwide class of plaintiffs.

## A.

We begin with a brief review of the standards that govern class action certification. We have recently addressed, in a different context, this Court's historical class action jurisprudence. *See Iliadis v. Wal-Mart Stores, Inc.,* 191 *N.J.* 88, 922 *A.*2d 710 (2007). As we pointed out in *Iliadis,* class action certification is governed by *Rule* 4:32-1. That *Rule* includes both general, *see R.* 4:32-1(a), and specific, *see R.* 4:32-1(b), requirements. *Iliadis, supra,* 191 *N.J.* at 106, 922 *A.*2d 710. The central question before us, as in *Iliadis,* is whether the putative class raises "questions of law or fact common to the members of the class [that] predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *R.* 4:32-1(b)(3). As we have previously held, the analysis of these aspects of the *Rule* must be " 'rigorous.' " *See Iliadis, supra,* 191 *N.J.* at 106-07, 922 *A.*2d 710 (quoting *Carroll v. Cellco P'ship,* 313 *N.J.Super.* 488, 495, 713 *A.*2d 509 (App.Div.1998) (quoting *Gen. Tele. Co. of the Sw. v. Falcon,* 457 *U.S.* 147, 161, 102 *S.Ct.* 2364, 2372, 72 *L.Ed.*2d 740, 752 (1982))). Moreover, our review includes searching " 'beyond the pleadings [to gain an] ... understand[ing of] the claims, defenses, relevant facts, and applicable substantive law.' " *Id.* at

107, 922 *A*.2d 710 (quoting *Carroll, supra,* 313 *N.J.Super.* at 495, 713 *A*.2d 509).

In *Iliadis, supra,* we explained the meaning of predominance, referring to the importance of an analysis of "the number, and more important the significance of common questions." 191 *N.J.* at 108, 922 *A*.2d 710 (citing *Carroll, supra,* 313 *N.J.Super.* at 499, 713 *A*.2d 509). We noted as well that "a court must decide whether the 'benefit from the determination in a class action [of common questions] outweighs the problems of individual actions.' " *Ibid.* (alteration in original) (quoting *In re Cadillac V8-6-4 Class Action,* 93 *N.J.* 412, 430, 461 *A*.2d 736 (1983)). Finally, we noted that "predominance requires, at [a] minimum, a 'common nucleus of operative facts.' " *Ibid.* (quoting *In re Cadillac, supra,* 93 *N.J.* at 431, 461 *A*.2d 736).

We recognized, as well, that there is no requirement that individual issues be absent, *ibid.* (citing *Varacallo v. Mass. Mut. Life Ins. Co.,* 332 *N.J.Super.* 31, 45, 752 *A*.2d 807 (App.Div.2000)), or "that the common issues dispose of the entire dispute," *ibid.* (citing *Strawn v. Canuso,* 140 *N.J.* 43, 67, 657 *A*.2d 420 (1995), *superseded on other grounds by, L.* 1995, c. 253, § 10 (codified at *N.J.S.A.* 46:3C–10), *as recognized in Nobrega v. Edison Glen Assocs.,* 167 *N.J.* 520, 772 *A*.2d 368 (2001)). Nor does predominance require that all issues be identical among class members or that each class member be affected in precisely the same manner. *See Fiore v. Hudson County Employees Pension Comm'n,* 151 *N.J.Super.* 524, 528, 377 *A*.2d 702 (App.Div.1977).

We also explained in *Iliadis* the meaning of the *Rule's*— requirement that a class be "superior" to other methods of adjudication. *Iliadis, supra,* 191 *N.J.* at 114, 922 *A*.2d 710. The superiority requirement involves " 'a comparison with alternative procedures,' " *ibid.* (quoting *In re Cadillac, supra,* 93 *N.J.* at 436, 461 *A*.2d 736), to evaluate both fairness and efficiency of the class action proceeding.

We there reiterated the basic principles that govern the decision concerning whether a particular proposed class meets the criteria

for superiority. In part, we noted that "our analysis demands '(1) an informed consideration of alternative available methods of adjudication of each issue, (2) a comparison of the fairness to all whose interests may be involved between such alternative methods and a class action, and (3) a comparison of the efficiency of adjudication of each method.'" *Id.* at 114–15, 922 *A.*2d 710 (quoting *In re Cadillac, supra,* 93 *N.J.* at 436, 461 *A.*2d 736 (quotation omitted in original)). More specifically, in *Iliadis,* we identified as important to the superiority analysis a consideration of the "class members' 'lack of financial wherewithal.'" *Id.* at 115, 922 *A.*2d 710 (quoting *Saldana v. City of Camden,* 252 *N.J.Super.* 188, 200, 599 *A.*2d 582 (App.Div.1991)). In such circumstances, we have expressed a concern that, absent a class, the individual class members would not pursue their claims at all, thus demonstrating superiority of the class action mechanism. *See ibid.*; *Muhammad v. County Bank of Rehoboth Beach,* 189 *N.J.* 1, 17, 912 *A.*2d 88 (2006), *cert. denied,* —— *U.S.* ——, 127 *S.Ct.* 2032, 167 *L.Ed.*2d 763 (2007).

In *Iliadis, supra,* we also referred, in part, to the significance of plaintiffs having "nominal" claims, 191 *N.J.* at 115, 922 *A.*2d 710 (citing *Varacallo, supra,* 332 *N.J.Super.* at 52, 752 *A.*2d 807), and to the role of class actions as an "equalizing mechanism" between adversaries of vastly different resources, *id.* at 115, 922 *A.*2d 710, as a part of the considerations that bear on the superiority analysis. To be sure, we also evaluated the available alternative dispute resolution forum, the importance of uniformity of outcome and the impact of differing statutes of limitations, *see id.* at 116, 922 *A.*2d 710, in concluding that, in *Iliadis,* a class action was indeed the superior adjudicatory mechanism, *see id.* at 117, 922 *A.*2d 710.

Finally, in *Iliadis,* we addressed the question of whether a class action would be unmanageable. Recognizing that rejection of a proposed class for reasons relating to its manageability is "disfavored," *ibid.,* we nevertheless acknowledged that some proposed class actions may present management issues of such magnitude

that certification should be withheld, *see id.* at 118, 922 *A.*2d 710. It is in light of this recent reiteration of the fundamental principles that guide certification of class actions generally that we must consider the issues presented in this matter.

## B.

In granting the motion for class certification, the Law Division concluded that the proposed class met the prerequisites for predominance and superiority. The court's conclusion about predominance rested on two related considerations.

First, the motion court concluded that the facts relating to defendant's marketing campaign, its suppression of adverse information, and its behavior in working to have Vioxx included in formularies were common to all members of the proposed class of third-party payors. Even though the court recognized that the decision of any particular P & T Committee, PBM, or third-party payor about adding this product to the formulary or about its placement in the formulary was an individual one, the court concluded that facts relating to the marketing campaign itself and the information distributed by defendant to those decision-makers were common to all class members. Second, the court found that common questions of law predominate because its choice of law analysis led it to conclude that New Jersey's Consumer Fraud Act (CFA), *N.J.S.A.* 56:8–1 to –166, should apply to all members of this nationwide class.

The motion court also found that a class action would be superior to other methods of affording relief to all potential plaintiffs, including being superior to pending federal multi-district litigation raising some, if not all, of the same claims. That conclusion was, in essence, a logical extension of the court's decision about the predominance of common questions of fact and law.

In a published opinion, the Appellate Division affirmed. *See Int'l Union of Operating Eng'rs Local # 68 Welfare Fund v. Merck & Co.,* 384 *N.J.Super.* 275, 894 *A.*2d 1136 (App.Div.2006).

Applying an abuse of discretion standard to the motion court's factual determinations, *see id.* at 283, 894 *A.*2d 1136 (citing *In re Cadillac, supra,* 93 *N.J.* at 436–39, 461 *A.*2d 736), and utilizing a de novo standard of review in evaluating the court's analysis of the questions of law, *see id.* at 284, 894 *A.*2d 1136 (citing *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995)), the appellate panel concluded that certification of a nationwide class was appropriate, *see id.* at 281, 894 *A.*2d 1136.

The panel noted that defendant concedes that there are some common issues and that the proposed class meets the basic prerequisites for class certification set forth in *Rule* 4:32–1(a). *See id.* at 285, 894 *A.*2d 1136. In the panel's analysis, then, the only questions were, in accordance with *Rule* 4:32–1(b)(3), whether "common questions predominate [and whether] a class action would be superior to other methods of adjudicating this controversy." *Ibid.* In addressing whether these criteria for class certification have been met, the appellate panel based its decision, in large part, on its conclusion that our CFA could be applied to all members of the class, *see id.* at 305, 894 *A.*2d 1136, and that therefore common questions of law would predominate.

In addition, although recognizing and cataloging the individual decision-making processes engaged in by the PBMs and, therefore, by the many potential class members, *see id.* at 282–83, 894 *A.*2d 1136, the appellate panel decided that there were also common questions of fact, *see id.* at 292, 894 *A.*2d 1136. As a part of that analysis, the panel reasoned that the CFA's ascertainable loss requirement need not be proven by each class member individually, but could be proven on a class-wide basis through expert testimony. *See id.* at 291, 894 *A.*2d 1136. Recognizing that a nationwide class action that applies a single state's law to all claims is "rare," *id.* at 303, 894 *A.*2d 1136, and that this class will "undoubtedly present management problems," *id.* at 304, 894 *A.*2d 1136, the appellate panel nevertheless concluded that neither of

those concerns militated against certification of this class, *see id.* at 305–06, 894 *A.*2d 1136.

## C.

Defendant moved for leave to appeal, raising three essential arguments. First, defendant contends that the Appellate Division erred in concluding that, in accordance with choice of law principles, the CFA can apply to a nationwide class. Second, defendant asserts that plaintiff's theory that it can meet the CFA's ascertainable loss on a class-wide basis amounts to a fraud on the market theory which this Court has previously held cannot apply outside the strict parameters of securities fraud litigation. Finally, defendant suggests that the appellate panel erred in concluding that a class action is superior to other mechanisms readily available to members of the class.

Plaintiff urges us to conclude that the Appellate Division's analysis is entirely correct. First, plaintiff argues that its evaluation of our choice of law principles was sound, with the result that the nationwide application of our CFA to all class members is appropriate. Second, plaintiff asserts that the CFA's ascertainable loss component may be met on a class-wide basis through expert proofs that need only establish some causal relationship between the defendant's acts and the injuries suffered by the members of the class. Further, plaintiff rejects defendant's contention that this method of proof equates with a fraud on the market theory. Finally, plaintiff suggests that a class action is indeed a superior mechanism for achieving a remedy.

We granted defendant's motion for leave to appeal and we also granted leave to submit amicus curiae briefs to a large and diverse number of entities.

## III.

Although the parties have suggested that the choice of law analysis, and the corollary decision to apply our CFA to all

members of the nationwide class, was the lynchpin for class certification and should therefore be the essential focus of this appeal, we do not adopt that approach. Rather, we address this class action certification, as we have others, by analyzing more generally the assertions about predominance and superiority.

In doing so, we note that defendant concedes that there are some common questions. To be sure, there is no disagreement about the fact that, whatever its specifics, defendant's marketing plan and withholding of adverse information did not vary as among potential consumers. Nor is there any difference in the facts as they relate to the FDA warning letters or the drug's eventual withdrawal from the market. We confront in this appeal, however, two essential questions. First, we consider whether those facts, even were we to agree that our CFA could be given nationwide application to all class members,[3] constitute common questions of fact or law that predominate. Second, we consider whether a class action is superior to other available mechanisms for redress of the claims raised by plaintiff.

A.

Our analysis of the fact questions, however, is intertwined with our consideration of the questions of law asserted to be common. If we were to agree with the appellate panel that our CFA could appropriately be applied to all members of this nationwide class, the proofs that our CFA would require, in and of themselves, demonstrate an overall lack of predominant common questions.

---

[3] As the appellate panel noted, certification of a nationwide class is "rare," *Int'l Union, supra,* 384 *N.J.Super.* at 303, 894 A.2d 1136, and application of the law of a single state to all members of such a class is even more rare. Although defendant advances strong arguments in support of its appeal from the Appellate Division's choice of law analysis, in light of our decision on predominance and superiority, we express no view on the Appellate Division's choice of law reasoning or the result it reached as to the applicability of our law to all members of a nationwide class.

We reach this conclusion for reasons that arise from the CFA itself.

 The CFA imposes liability on any person who uses: "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission." *N.J.S.A.* 56:8–2. Consumer fraud violations are divided broadly "into three ... categories: affirmative acts, knowing omissions, and regulatory violations." *Cox v. Sears Roebuck & Co.*, 138 *N.J.* 2, 17, 647 *A.*2d 454 (1994). Thus, to state a CFA claim, a plaintiff must allege "three elements: (1) unlawful conduct ...; (2) an ascertainable loss ...; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." *N.J. Citizen Action v. Schering–Plough Corp.*, 367 *N.J.Super.* 8, 12–13, 842 *A.*2d 174 (App.Div.), *certif. denied*, 178 *N.J.* 249, 837 *A.*2d 1092 (2003).

Our statute essentially replaces reliance, an element of proof traditional to any fraud claim, with the requirement that plaintiff prove ascertainable loss. *See Thiedemann v. Mercedes–Benz USA, LLC,* 183 *N.J.* 234, 246, 872 *A.*2d 783 (2005); Sheila B. Scheuerman, *The Consumer Fraud Class Action, Reining in Abuse by Requiring Plaintiffs to Allege Reliance as an Essential Element,* 43 *Harv. J. on Legis.* 1, 25–30 (2006) (surveying different requirements for proof of traditional fraud element of reliance in consumer fraud statutes nationwide).

 Our analysis requires us to consider, in light of the requirements of our CFA,[4] what questions of fact or law are common and

---

[4] In framing the issues for this Court in the motion for leave to appeal, the parties sought to focus on the choice of law decision that led to the application of our CFA to all class members. Although they theorized that it was the application of our CFA itself that created a common question of law, we do not agree with the premise that reliance on the CFA necessarily created a common question that meets the test for predominance.

whether those questions predominate in the sense required for certification of a class. In addressing this aspect of the appeal, the parties rely on different parts of the record. We begin with a brief recitation of the particular facts that each party asserts are relevant to the question of predominance.

Plaintiff argues that we should focus on the facts relating to the conduct engaged in by defendant in marketing its product and in withholding important information about the product's risks from the FDA and the public. In doing so, plaintiff asserts that all of the facts relating to defendant's behavior and its marketing campaign are common to all class members. Moreover, plaintiff argues that each member of the proposed class received the same information and was a target of the same deceptive campaign.

Defendant argues that we should instead consider the facts that relate to the members of the class more generally. As such, defendant points out that the essence of the claims must be that each class member was injured individually when it decided, based on defendant's allegedly fraudulent conduct, to include Vioxx in its formulary and, more to the point, when it paid for the drug purchased by plan members in its home state. Defendant further suggests that because each class member made that evaluation at different times and based on different criteria and because each reacted differently with regard to formulary placement even after the facts that allegedly prove the fraud became known, there are overwhelmingly individual, rather than common, questions of law and fact. This fundamental dispute about focus forms the heart of the debate on appeal.

Although the record does not identify the members of the proposed class, other than the named plaintiff, with any precision, the available information makes it plain that they are a diverse group of entities. More important to our analysis, however, plaintiff does not suggest that each of these proposed class members, receiving the same information from defendant, reacted in a uniform or even similar manner. Rather, the record speaks loudly in its demonstration that each third-party payor, relying on

PBMs and P & T Committees, made individualized decisions concerning the benefits that would be available to its members for whom Vioxx was prescribed. The evidence about separately created formularies, different types of tier systems, and individualized requirements for approval or reimbursement imposed on various plans' members and, to some extent, their prescribing physicians, are significant. That evidence convinces us that the commonality of defendant's behavior is but a small piece of the required proofs. Standing alone, that evidence suggests that the common fact questions surrounding what defendant knew and what it did would not predominate.

### B.

Nationwide application of our CFA would create a further consideration important to our analysis of predominance. As a part of its argument, plaintiff asserts that the common facts surrounding defendant's marketing scheme created an effect on the price of Vioxx such that the ascertainable loss element of our CFA may be proven, on a class-wide basis, by reliance on expert analysis alone. Defendant urges us to conclude that plaintiff's approach cannot demonstrate ascertainable loss as required by our CFA because it amounts to a "fraud on the market" theory.

We need only briefly address this aspect of the dispute. Our CFA does not require proof that a consumer has actually relied on a prohibited act in order to recover. In place of the traditional reliance element of fraud and misrepresentation, we have required that plaintiffs demonstrate that they have sustained an ascertainable loss. Most recently, in *Thiedemann, supra,* we discussed at length the meaning of this concept and its importance to CFA litigation.

Fraud on the market is essentially a creature of federal securities litigation. *See Kaufman v. i-Stat Corp.,* 165 *N.J.* 94, 97, 754 *A.*2d 1188 (2000). In that context, plaintiffs who purchased securities are permitted to demonstrate that they were damaged simply because defendant engaged in behavior otherwise prohibited and

there was a change in price. *See ibid.* The theory therefore presumes reliance. *See Basic Inc. v. Levinson,* 485 *U.S.* 224, 108 *S.Ct.* 978, 99 *L.Ed.*2d 194, (1988); *Blackie, supra,* 524 *F.*2d at 906 (explaining rationale for permitting fraud on market theory in securities fraud litigation); *see also Finkel v. Docutel/Olivetti Corp.,* 817 *F.*2d 356, 359–62 (5th Cir.1987) (limiting fraud on market theory to specified varieties of securities fraud claims), *cert. denied,* 485 *U.S.* 959, 108 *S.Ct.* 1220, 99 *L.Ed.*2d 421 (1988).

We have rejected the fraud on the market theory as being inappropriate in any context other than federal securities fraud litigation. *See Kaufman, supra,* 165 *N.J.* at 97–98, 754 *A.*2d 1188. Therefore, to the extent that plaintiff seeks to prove only that the price charged for Vioxx was higher than it should have been as a result of defendant's fraudulent marketing campaign, and seeks thereby to be relieved of the usual requirements that plaintiff prove an ascertainable loss, the theory must fail. *See N.J. Citizen Action, supra,* 367 *N.J.Super.* at 15–16, 842 *A.*2d 174 ("[P]laintiffs must nonetheless plead and prove a causal nexus between the alleged act of consumer fraud and the damages sustained.").

Plaintiff argues that it should be permitted to demonstrate class-wide damages through use of a single expert who would opine about the effect on pricing of the marketing campaign in which defendant engaged. To the extent that plaintiff intends to rely on a single expert to establish a price effect in place of a demonstration of an ascertainable loss or in place of proof of a causal nexus between defendant's acts and the claimed damages, however, plaintiff's proofs would fail. That proof theory would indeed be the equivalent of fraud on the market, a theory we have not extended to CFA claims.

The significance of plaintiff's planned approach to proof of ascertainable loss is clear. To the extent that plaintiff proposed, and the Appellate Division authorized, the use of a single expert to establish this critical CFA proof element so as to create a common question of fact or law that would bear on the predominance

analysis, our rejection of the theoretical basis for that proof mechanism removes it as a potential common question entirely.

## C.

■ Finally, we address a further, fundamental, question relating to the proposed class. In short, defendant argues that, under any circumstances, certification of a class as defined by plaintiff cannot be appropriate. Focusing on the relatively large sum of damages that this plaintiff contends it has individually sustained as a result of defendant's marketing of Vioxx, defendant argues that a class action is not appropriate. Whether we regard this as an attack on the superiority prong of the test or as a general question about the propriety of certification for this proposed class in general, it has independent merit.

We reach this conclusion based on our recent analysis of class actions as expressed in our *Iliadis* decision. Although we need not repeat any of the more general matters to which we there adverted, it is the differences between the proposed class members here and those in *Iliadis* that requires us to reach a different result in this matter than the one we reached there.

In *Iliadis, supra,* we considered claims raised by a proposed class of individual hourly wage earners, numbering in the thousands. *See* 191 *N.J.* at 95, 922 *A.*2d 710. The essential theory of recovery asserted on behalf of that putative class rested on allegations of corporate-wide policies designed to deny the individuals compensation for relatively small units of time that they worked under circumstances when they were, by company-wide contract terms, entitled to be paid. *See id.* at 95–96, 115–17, 922 *A.*2d 710. The amount that any individual worker might ultimately or potentially recover in damages was small. *See id.* at 115, 922 *A.*2d 710. The class numbered in the thousands. *See id.* at 95, 922 *A.*2d 710. Individually, they would be greatly disadvantaged in any effort to pursue their claims against a large corporate defendant. *See id.* at 104–05, 922 *A.*2d 710. We concluded that, in accordance with well-established principles governing class

actions, the *Iliadis* class should be certified. *See id.* at 120–21, 922 *A.*2d 710.

It was, perhaps, the quintessential example of facts and circumstances that would support class-wide relief. In particular, we noted that the specifics of the manner in which the defendant was alleged to have accomplished its goal of diminishing the compensation otherwise due the class members, the small amount that any one class member would be due, and the large number of class members for whom relief would otherwise not be practically available, all militated in favor of a conclusion that the common issues predominated and the class action mechanism was superior to any other forum for relief. We did not depart, in that analysis, from our traditional class action jurisprudence, but stayed squarely within its ordinary parameters.

It is in light of that background that we cannot escape the vast differences between that appropriate use of the class action device and the present inappropriate one. Unlike the individual wage earners there, plaintiff and, by extension, all of the members of the class, allege that they have been damaged in large sums. Unlike those hourly wage earners, plaintiff and the other third-party payors are well-organized institutional entities with considerable resources. Unlike in *Iliadis,* here we see no disparity in bargaining power and no likelihood that the claims are individually so small that they will not be pursued. In short, we find no ground on which to conclude that this proposed nationwide class meets the test for superiority that we have traditionally required.

IV.

The judgment of the Appellate Division is reversed and this matter is remanded to the Law Division for further proceedings consistent with this opinion.

*For reversal and remandment*—Justices LONG, LaVECCHIA, WALLACE, RIVERA–SOTO and HOENS—5.

*Opposed*—None.