**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3032
_____

MARK MANISCALCO*; WALTER HURYK, on behalf of
themselves and all others similarly situated

v.

BROTHER INTERNATIONAL (USA) CORPORATION

Walter Huryk,
Appellant

*Dismissed pursuant to USCA Order of January 24, 2012
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil No. 06-cv-04907)
District Judge:  Honorable Freda L. Wolfson
_____

Argued:  January 16, 2013
_____

Before: SMITH, CHAGARES and BARRY, <u>Circuit Judges</u>

(Opinion Filed: March 08, 2013)
_____

Douglas J. McNamara, Esq. (Argued)
Lisa M. Mezzetti, Esq.
Cohen Milstein
1100 New York Avenue, N.W.

1

West Tower, Suite 500
Washington, DC 20005-0000

*Counsel for Appellant*

Michael R. McDonald, Esq. (Argued)
Melissa C. Dehonney, Esq.
Lan Hoang, Esq.
Christopher Walsh, Esq.
Gibbons
One Gateway Center
Newark, NJ 07102

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

BARRY, *Circuit Judge*

## I.  INTRODUCTION

Walter Huryk ("Huryk") appeals the order of the District Court granting summary judgment in favor of Brother International Corp. ("BIC") and dismissing his putative class action claim under the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-2.  The District Court dismissed that claim—a claim for concealing or failing to disclose two design defects present in BIC's line of Multi-Function Center ("MFC") machines—on the ground that South Carolina law, not New Jersey law, is the applicable law. We will affirm.

## II.     BACKGROUND

BIC is a Delaware corporation with a principal place of business and headquarters in New Jersey.  It is the primary distributor of MFC machines that are manufactured by Brother Industries, Ltd. ("BIL"), BIC's parent entity located

in Japan.  BIC began distributing the Brother 3220C, a small printer, fax machine, scanner and copier, around August or September 2001.  Each MFC machine sold was accompanied by a Limited Warranty and User Manual drafted by BIL in Japan and translated by BIC.  The Limited Warranty provided that the MFC would be "free from defects in materials and workmanship, when used under normal conditions" for one year, and BIC agreed to repair or replace MFC machines if a defect was reported to BIC or an authorized service center within the applicable warranty period.  Huryk alleges that from 2002 to 2005, BIC and its customer relations, technical and marketing executives in New Jersey knew about but concealed information regarding two defects in the Brother 3220C: (1) a defect that caused printer heads to fail and display the message "Machine Error 41" before the end of the MFC's expected useful life; and (2) a defect that caused the machines to purge excess amounts of ink when not used frequently enough.

## A.  The Machine Error 41 ("ME41") Defect

Sometime in 2001, BIC began to receive phone calls complaining about the appearance of an error message— "Machine Error 41"—that would flash across the LCD screen of the MFC indicating a voltage issue in the print heads of affected machines and causing the machines to stop printing until the error message was cleared.  Nineteen calls regarding the ME41 defect were received that year.  In some cases, the message could be cleared by unplugging and replugging the affected machine.  In others, the message could not be cleared without replacing the print heads, which, for owners no longer covered by warranty, cost approximately the same amount as the machine itself.  By 2002, BIC knew that the ME41 problem related to complications in the machines' print heads but had not yet determined the cause.  In August 2002, BIC submitted a fault report[1] to bring the quality issues and

_____

[1] A fault report is the method by which BIC alerted BIL of quality issues after some threshold triggering event, such as an unusually large number of customer complaints or a quality problem of a particularly serious magnitude.  BIC

3

customer calls BIC had been receiving to BIL's attention in Japan.  BIL investigated the matter, and in November 2002 provided BIC with a "temporary troubleshooting guide" with potential solutions BIC field personnel could implement when encountering customers complaining of ME41 defects.  In 2003, BIC opened two more fault reports concerning the ME41 issue, stating that the defect was the "number 1 quality issue on this product."  A. 1674.  By the end of 2003, BIC unilaterally extended the print head warranty on machines affected by the ME41 defect to eighteen months, and requested from BIL "warranty reimbursement and a no cost print head." A. 1738.  In mid-2004, BIL informed BIC that it had discovered the cause of the ME41 defect but did not know how to fix it.  By the end of the year, BIC lowered the cost of replacement print heads from approximately $130 to approximately $20 and $10.  In early 2005, BIC again extended the print head warranty, this time, to two years from the date of purchase, and sent an e-mail notice to registered customers who were within the twenty-four month extended warranty period.  In June 2005, BIL discovered a permanent fix to the ME41 defect and applied the fix to new MFC machines.  The only permanent fix for old machines affected by the defect was replacement of the print head.

### B. The Ink-Purging Defect

In or around August 2004, BIC's New Zealand counterpart opened up a fault report to launch an investigation into the source of a defect in some MFC models that would cause the machines to purge excess amounts of ink.  Essentially, as part of their routine cleaning process, affected machines would purge ink too often, emptying ink cartridges within seven months or less when the ink should have lasted fifteen to twenty months.[2]  In September 2004, BIC made

would provide a description of the problem to BIL, and BIL would investigate and attempt to solve the problem.  As part of the fault report process, BIC often sent samples to BIL of MFCs affected by the defect.

[2] Ink is commonly used in similar machines as part of the routine cleaning process.  The ink-purging defect occurred

available to its authorized service centers modified software to address the ink-purging defect. In March 2005, BIC created a CD with the modified software that it provided to owners for self-installation. In June 2005, BIC posted the revised software to its website. BIC, however, did not reach out to machine owners to notify them about the defect or the availability of the revised software; rather, customers learned about the modified software only by discovering it on their own on the website or by contacting BIC about the defect.

### C. Walter Huryk

Huryk, a South Carolina resident, purchased a Brother 3220C for approximately $125 from an Office Depot retail store in South Carolina on December 11, 2003. The MFC came with the Limited Warranty and User Manual described above. Based on his professional experience as an executive of a printing company and personal experience with office equipment, Huryk believed his MFC would last between five and seven years. In early 2007, Huryk's machine displayed the ME41 defect, and by April 2007, stopped working altogether. Huryk became aware of the pending litigation on April 24, 2007, and one day later disconnected his machine, for some reason disposing of it by placing it on the curb.

In October 2007, Huryk joined in a putative class action alleging that the MFC he purchased contained the ME41 defect and the ink-purging defect, and that BIC's omissions and concealments concerning the defects constituted a violation of the NJCFA. Huryk alleges that his machine ceased functioning as a result of BIC's failure to disclose defects, causing losses because Huryk had to purchase more ink than he otherwise would have, paid more for his MFC machine than it was worth, and had to purchase a replacement machine. Huryk contends that BIC's omissions and concealments in New Jersey included: (1) observing and

---

when the automated cleaning process took place too frequently. For the Brother 3320C, this typically happened when the machine had been rarely used, paradoxically resulting in faster ink loss.

participating in the investigation of the ME41 defect without disclosing it to consumers; (2) persuading BIL not to recall the machines; (3) rejecting the option of suspending sales of the machines; (4) intentionally manipulating the warranty extension announcement by burying it in the company's website; (5) publishing misleading solutions to the ME41 defect on its website; (6) learning but failing to disclose the breadth of the ink-purging defect; (7) manipulating its website to make it appear the ink-purging software fix was an "upgrade" and not a solution to a defect; and (8) hiding from its customer service operators information about the software defect.

BIC moved for summary judgment, arguing that New Jersey law did not apply to Huryk's claim, and, in the alternative, that even if New Jersey law did apply, Huryk could not establish (1) an ascertainable loss, (2) a causal connection between the alleged conduct and his harm, or (3) that BIC engaged in any wrongful conduct, as required by the NJCFA. The District Court granted BIC's motion and dismissed the action, finding that under New Jersey choice-of-law rules, the factors set forth in the Restatement (Second) of Conflicts of Law weighed in favor of applying the law of Huryk's home state of South Carolina, and that South Carolina had the most significant relationship with the litigation. Huryk now appeals.

## III. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), and we have appellate jurisdiction under 28 U.S.C. § 1291. "We exercise plenary review over the District Court's choice of law determination." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir. 2007).

## IV. ANALYSIS

A federal court sitting in diversity applies the choice-of-law rules of the forum state—here, New Jersey—to determine the controlling law. *Klaxon Co. v. Stentor Elec.*

*Mfg. Co. Inc.*, 313 U.S. 487, 496 (1941); *Thabault v. Chait*, 541 F.3d 512, 535 (3d Cir. 2008). New Jersey has adopted the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws. *P.V. v. Camp Jaycee*, 962 A.2d 453, 459-60 (N.J. 2008). This is a two-part test.

The first part of the choice-of-law inquiry is to determine whether or not an actual conflict exists between the laws of the potential forums. *Lebegern v. Forman*, 471 F.3d 424, 429-30 (3d Cir. 2006); *see Camp Jaycee*, 962 A.2d at 460 ("Procedurally, the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether there is distinction between them. . . . If not, there is no choice-of-law issue to be resolved.") (internal citations and quotations omitted). There is no dispute that there is a conflict between New Jersey and South Carolina consumer fraud law, a conflict that, indeed, would be dispositive of Huryk's putative class action. Among other differences, South Carolina, unlike New Jersey, would not permit the statutory consumer fraud claims to proceed as a class action. *See* S.C. Code. Ann. § 39-5-140(a) ("Any person who suffers any ascertainable loss . . . as a result of . . . an unfair or deceptive method, act or practice declared unlawful by [the consumer fraud statute] may bring an action individually, but not in a representative capacity, to recover actual damages.").

Under the second part of the inquiry, the court must determine which jurisdiction has the "most significant relationship" to the claim. *Camp Jaycee*, 962 A.2d at 461. Where a fraud or misrepresentation claim has been alleged, the court looks to the factors set forth in § 148 of the Restatement (Second) of Conflict of Laws. Under subsection (1) of § 148, when the "plaintiff's action in reliance took place in the state where the false representations were made and received," there is a presumption that the law of that state applies. Under subsection (2), when the plaintiff's action in reliance takes place in a different state than where the false representations were made and received, courts weigh the following factors:

7

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

§ 148(2). "The factors enumerated in [the Restatement] should be evaluated on a qualitative rather than a quantitative basis." *David B. Lilly Co. v. Fisher*, 18 F.3d 1112, 1119 (3d Cir. 1994) (discussing sections 145 and 146 of the Restatement). The relative importance to each of the factors in a given case "should be determined in light of the choice-of-law principles stated in § 6 [of the Restatement]." Restatement (Second) of Conflict of Laws § 148 cmt. e. Those principles are: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." *Camp Jaycee*, 962 A.2d at 463 (internal quotation omitted).

As a threshold matter, we must determine which subsection of the Restatement to apply, i.e., whether the subsection (1) presumption in favor of the state of Huryk's reliance applies, or whether we must weigh the five factors

enumerated in subsection (2). BIC argued in the District Court for the application of subsection (1) and its presumption that South Carolina provides the controlling law because any representation made by BIC—such as the Limited Warranty and User Manual—was *directed to* Huryk in South Carolina. We recognize that several courts have agreed under similar circumstances. This line of cases reasons that the representations—or, as here, omissions—even if *originated* from the headquarters state are actually *made* in the purchaser's home state when they are directed to the purchaser's home state at the point of sale. *See Laney v. Am. Standard Cos., Inc.*, Civ. No. 07-7991, 2010 WL 3810637, at *22 (D.N.J. Sept. 23, 2010) (following §148(1) and holding that each plaintiff's state's consumer fraud laws should apply in omissions case where plaintiff alleged that defendant manufacturer failed to disclose latent defect because the relevant warranties were directed to customers in their home states); *Agostino v. Quest Diagnostics, Inc.*, 256 F.R.D. 437, 463 (D.N.J. 2009) (applying §148(1) to case in which plaintiff alleged a billing scheme emanating from New Jersey where bills were sent to plaintiffs in their home states).

We find this approach contradictory to the plain language of the Restatement. The Restatement applies the presumption of subsection (1) only when "the plaintiff's action in reliance took place in the state where the false representations were made *and* received." Restatement (Second) of Conflict of Laws §148(1) (emphasis added). Construing the location to which a representation is "directed" to be the same in which one is "made"—as opposed to the location from which the representation emanated—would render meaningless the Restatement drafters' careful distinction between "made" and "received." Under the *Agostino*/*Laney* approach, a plaintiff's state of receipt would become the only relevant contact in nearly every case in which a defendant is a multistate seller. It would be antithetical to traditional choice-of-law principles to disregard the locale of a defendant's actual misconduct. *See* Restatement (Second) of Conflict of Laws § 148 cmt. c. Here, Huryk alleges fraudulent omissions that directly emanated from decisions made in BIC's headquarters in New

9

Jersey, not at the point of sale in South Carolina. Because Huryk received and relied on BIC's representations in his home state of South Carolina, and there was no evidence demonstrating that BIC made any omissions or misrepresentations in South Carolina, the District Court properly applied subsection (2) of the Restatement.[3] *See, e.g.*, *Arlandson v. Hartz Mountain Corp.*, 792 F. Supp. 2d 691, 708-09 (D.N.J. 2011) (applying subsection (2) under similar circumstances); *Nikolin v. Samsung Elecs. Am., Inc.*, Civ. No. 10-1456, 2010 WL 4116997, at *4 (D.N.J. Oct. 18, 2010) (same).

Under subsection (2), three of the six contacts weigh strongly in favor of applying South Carolina law: (a) the place where Huryk acted in reliance upon BIC's representations, (b) the place where Huryk received the representations, and (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time. Factor (f) is not applicable because there is no contract in the case. Although Huryk is a domiciliary of South Carolina and BIC's place of business is in New Jersey, factor (d) weighs slightly in favor of applying South Carolina law. *See* § 148 cmt. i. (noting, in cases of pecuniary loss, that "[t]he domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant" because "financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship"). The only remaining questions are whether the place where BIC's alleged omissions took place, factor (c), weighs in favor of applying New Jersey law, and, if so, whether this contact is of such significance that it outweighs the contacts in favor of applying South Carolina law. We find that it does not.

Accepting Huryk's premise that there were actionable

---

[3] Although, as we will explain, we do not agree with the court's conclusion, we refer the reader to the thoughtful discussion of the difference between the two subsections in *In re Mercedes-Benz Tele Aid Contract Litigation*, 257 F.R.D. 46, 65-66 (D.N.J. 2009).

omissions by BIC at its headquarters in New Jersey, we conclude that this single contact—factor (c)—does not warrant applying New Jersey law. Nothing else about the relationship between the parties, other than the fortuitous location of BIC's headquarters, took place in the state of New Jersey.[4] Huryk's home state, in which he received and relied on BIC's alleged fraud, has the "most significant relationship" to his consumer fraud claim. In so concluding, we adopt the overwhelming majority of courts' application of New Jersey choice-of-law rules under similar circumstances. *See, e.g.*, *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 449 (D.N.J. 2012) ("A majority of courts in this District have held that the mere fact that a company is headquartered in New Jersey or that unlawful conduct emanated from New Jersey will not supersede the numerous contacts with the consumer's home state for purposes of determining which state has the most significant relationship under Restatement § 148(2).") (internal quotation marks omitted); *Arlandson*, 792 F. Supp. 2d at 709 (applying consumer fraud law of plaintiffs' home states where they "received and relied upon the alleged misrepresentations . . . , the product is located . . . , and the performance of the contract was rendered" even where alleged misrepresentations were made in New Jersey); *Maloney v. Microsoft Corp.,* Civ. No. 09-2047, 2011 WL 5864064, at *10 (D.N.J. Nov. 21, 2011) (same); *Nikolin*, 2010 WL 4116997, at *4 ("[M]ere allegations that the unlawful conduct emanated from New Jersey did not outweigh the substantial ties to plaintiffs' home states based on the other factors under § 148(2)."); *Warma Witter Kreisler, Inc. v. Samsung Elecs. Am., Inc.*, Civ. No. 08-5380, 2010 WL 1424014, at *4 (D.N.J. Apr. 8, 2010) (holding that "allegation that [the defendant] designed the product's operation in New

---

[4] The District Court held that the record failed to establish any facts pointing to a decision to omit or conceal a material fact concerning the ME41 and ink-purging defects by BIC in New Jersey, a conclusion with which—as was made clear in oral argument—Huryk disagrees. As discussed *infra*, even if the record could establish that some BIC wrongdoing emanated from New Jersey, we would find that South Carolina, not New Jersey law, would apply.

Jersey does not outweigh the other, more significant, ties to Illinois"); *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co. Inc.*, 929 A.2d 1076, 1086 n.3 (N.J. 2007) (reversing certification of nationwide class action under NJCFA on other grounds, but noting that application of the law of a single state to all members of a nationwide class is "rare" and acknowledging defendant's "strong arguments" under choice-of-law principles that each plaintiff's home state's law should apply); *Fink v. Ricoh Corp.*, 839 A.2d 942, 990-91 (N.J. Super. Ct. 2003) (applying law of each plaintiff's state in large consumer fraud action).

Our conclusion is supported by the authors' commentary accompanying § 148(2): "If any two of the [148(2)] contacts, apart from the defendant's domicil, state of incorporation or place of business, are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues." Restatement (Second) of Conflicts of Law § 148, cmt j. Here, Huryk's reliance, his receipt of the representation, the location of the MFC, and the sale, all took place in South Carolina. Accordingly, the § 148(2) factors weigh strongly in favor of applying South Carolina law.

Applying Section 6 of the Restatement also bolsters the conclusion that South Carolina law has the greater interest in the litigation. First, the interests of interstate comity favor applying the law of the individual claimant's own state. Applying New Jersey law to every potential out-of-state claimant would frustrate the policies of each claimant's state. *See Fink*, 839 A.2d at 983 (finding that the interests of interstate comity "clearly require application of the law of any potential claimant's state of residence because application of any other state's law would frustrate the domiciliary state's legislative policies"). Second, the interest of the parties favors applying South Carolina law: because the only contacts between the parties took place in South Carolina, it is reasonable to assume that they expected that South Carolina law would apply. The third section 6 factor likely favors neither state. Consumer fraud law serves the dual purposes of compensating injured parties—which might favor South

Carolina law—and deterring corporate misconduct—which might favor New Jersey law. Fourth, while the interests of judicial administration might favor applying one state's law in a putative class action, rather than the law of each plaintiff's home state, New Jersey courts have found that the interests of judicial administration must yield to the interests of the other factors. *Fu v. Fu*, 733 A.2d 1133, 1142 (N.J. 1999). Finally, and most importantly, the interest of South Carolina in having its law apply to its own consumers outweighs the interests of New Jersey in protecting out-of-state consumers from consumer fraud. *See Knox v. Samsung Elecs. Am., Inc.*, Civ. No. 08-4308, 2009 WL 1810728, at *4 (D.N.J. June 25, 2009) ("Although it is true that New Jersey seeks to prevent its corporations from defrauding out-of-state consumers, it is not clear to this Court that New Jersey intended out-of-state consumers to engage in end runs around local law in order to avail themselves of collective and class remedies that those states deny."); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 348 (D.N.J. 1997) ("Each plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws.").

Huryk relies heavily on *In re Mercedes-Benz Tele Aid Contract Litigation*, 257 F.R.D. 46 (D.N.J. 2009) ("*Tele Aid*"), in which the district court found that New Jersey law should apply in a class action involving out-of-state plaintiffs alleging that Mercedes-Benz made false statements and omissions under the NJCFA when promoting vehicles equipped with an emergency response system which Mercedes-Benz allegedly knew would become obsolete. Although finding that three of the § 148 factors weighed in favor of applying the laws of each plaintiff's home state, the court concluded that the state from which the defendant's omissions and misrepresentations "emanated," New Jersey, had a greater interest in the litigation. It reasoned that while "each of the states from which class members will be drawn has an interest in assuring that its citizens will be compensated for any harm they may have suffered . . . [,] [o]nly New Jersey . . . possesses the additional interest in

13

regulating a corporation headquartered within its borders." *Id.* at 68. It found that the NJCFA's interest in deterring local corporations—by permitting class actions and treble damages—"would be compromised if the company were subjected to the law of states that do not [have such remedies available] in consumer fraud cases." *Id.*

While, to be sure, New Jersey has an interest in deterring misconduct by corporations headquartered within its borders, it is far from clear that this interest would be sufficient to outweigh other significant contacts with a plaintiff's home state. New Jersey's deterrent interest might well be served by actions involving in-state plaintiffs or actions involving additional contacts within New Jersey without opening the floodgates to nation-wide consumer fraud class actions brought by out-of-state plaintiffs involving transactions with no connection to New Jersey other than the location of the defendant's headquarters.

But even were we to find the reasoning of the *Tele Aid* court persuasive, the case before us is distinguishable. In *Tele Aid*, the court was bound at the motion to dismiss stage to accept as fact that the defendant's marketing team was solely responsible for any alleged misrepresentations and omissions, and that all of the misconduct took place in New Jersey. Here, however, the District Court found that any representations or omissions relied on by Huryk were made by BIL in Japan, where the Limited Warranty and User Manual was authored. The District Court expressly held that Huryk had not demonstrated "any facts pointing to a decision to omit or conceal a material fact" by BIC in New Jersey. Even accepting Huryk's premise that the District Court erred by overlooking certain conduct that occurred at BIC's headquarters in New Jersey—such as obscure or buried website announcements and BIC's decision not to recall the machines or fully refund purchasers—it is undisputed that at least some of the allegedly wrongful conduct emanated from Japan, at BIC's parent company, in its failure to disclose latent defects. It is also undisputed that BIL authored the Limited Warranty and User Manual, the only representations made to Huryk in connection with his MFC at the point of

14

sale, and that BIL was significantly involved in decisions regarding how to address the ME41 and ink-purging defects.

One final observation in this regard. The Restatement instructs courts to discount the relative weight of the place where the defendant made the false representations when the alleged representations (or omissions or concealments in this case) are made in two or more states. Restatement (Second) of Conflict of Laws § 148 cmt. h. ("The making of the representations provides a more important contact when the representations are made only in one state than when they are made in two or more."). Here, it is undisputed that at least some of the responsibility for BIC's alleged failure to disclose the ME41 and ink-purging defects lies with decisionmakers in Japan. Because the alleged omissions or concealments took place in New Jersey *and* Japan, factor (c) of the Restatement does not weigh strongly in favor of applying New Jersey law.

Viewed in light of the principles of § 6 as well as the commentary accompanying the Restatement, we find that the factors enumerated in subsection (2) of § 148 point decisively in favor of applying South Carolina law. Accordingly, BIC's motion for summary judgment was properly granted.[5]

## V.    CONCLUSION

The order of the District Court will be affirmed.

---

[5] Because we find that New Jersey law does not apply, we need not reach BIC's alternative argument that Huryk had not established a violation of the NJCFA, and that the District Court had so found.